**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **FRANK BATES;** | § | |
| **RICHARD N. BROWN;** | § | |
| **BRUCE D. COCHRAN;** | § | |
| **ROSE MARY CRAWFORD, AS** | § | |
| **REPRESENTATIVE OF THE ESTATE OF** | § | |
| **OTTO CRAWFORD, JR.;** | § | **CIVIL ACTION NO._____** |
| **WANDA PETERSON, AS REPRESENTATIVE** | § | |
| **OF THE ESTATE OF BARNEY CUEVAS;** | § | |
| **SAMMIE L. DAVIS;** | § | |
| **RICHARD U. EVANS;** | § | **JURY TRIAL REQUESTED** |
| **ROBERT L. EVANS;** | § | |
| **KENNETH LAURE FIRTH;** | § | |
| **WILLIE A. GALLOWAY;** | § | |
| **OTIS L. GREER;** | § | |
| **WILBERT L. INGE, SR;** | § | |
| **JOE EARL JACKSON;** | § | |
| **TROY W. JACKSON;** | § | |
| **CHARLES M. JAMES;** | § | |
| **ELISHEY O. JAMES;** | § | |
| **JERRAL JORDAN, AS REPRESENTATIVE** | § | |
| **OFTHE ESTATE OF JIMMIE JORDAN;** | § | |
| **BETTY JUDGE, AS REPRESENTATIVE OF** | § | |
| **THE ESTATE OF CHARLES R. JUDGE;** | § | |
| **ROBERT KEYES;** | § | |
| **EDDIE F. KINNARD;** | § | |
| **KENNY J. LADNER, AS REPRESENTATIVE** | § | |
| **OF THE ESTATE OF L.B. LADNER;** | § | |
| **JULIUS LYNUM;** | § | |
| **LONNIE R. MAXIE;** | § | |
| **JAMES R. MCCORMICK;** | § | |
| **JAMES K. MILLER;** | § | |
| **FRAZIER NASH;** | § | |
| **LEE BERTHA PENNINGTON, AS** | § | |
| **REPRESENTATIVE OF THE ESTATE OF** | § | |
| **EUNICE T. PENNINGTON;** | § | |
| **JAMES W. SCOTT;** | § | |
| **RONALD G. SELLERS;** | § | |
| **ERNEST R. SMITH;** | § | |
| **JAMES B. SMITH;** | § | |
| **WILLIAM E. SMITH; AND** | § | |
| **DORMAN W. WHITTINGTON** | § | |

| | |
|---|---|
| *PLAINTIFFS* | § |
| | § |
| VS. | § |
| | § |
| RICHARD N. LAMINACK, | § |
| JOHN M. O'QUINN & ASSOCIATES, | § |
| PLLC D/B/A THE O'QUINN LAW FIRM, | § |
| JOHN M. O'QUINN & ASSOCIATES L.L.P., | § |
| JOHN M. O'QUINN, P.C., JOHN M. O'QUINN | § |
| LAW FIRM, PLLC | § |
| T. GERALD TREECE, INDEPENDENT | § |
| EXECUTOR OF THE ESTATE OF JOHN M. | § |
| O'QUINN, DECEASED, | § |
| CHRISTIAN A. STEED, | § |
| MICHAEL J. LOWENBERG | § |
| BUFFY MARTINES, | § |
| THOMAS W. PIRTLE, | § |
| PAUL DANZINGER, ROD R. DE LLANO | § |
| DANZIGER & DE LLANO, LLP, | § |
| MARVIN SCHRAGER, ROBERT MUELLER | § |
| MUELLER & SCHRAGER, PC | § |
| STACIE F. TAYLOR | § |
| ABEL MANJI | § |
| *DEFENDANTS* | § |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs, **FRANK BATES, RICHARD N. BROWN, BRUCE D. COCHRAN, ROSE MARY CRAWFORD AS REPRESENTATIVE OF THE ESTATE OF OTTO CRAWFORD, JR., WANDA PETERSON AS REPRESENTATIVE OF THE ESTATE OF BARNEY CUEVAS, SAMMIE L. DAVIS, RICHARD U. EVANS, ROBERT L. EVANS, KENNETH LAURE FIRTH, WILLIE A. GALLOWAY, OTIS L. GREER, WILBERT L. INGE, SR, JOE EARL JACKSON, TROY W. JACKSON, CHARLES M. JAMES, ELISHEY O. JAMES, JERRAL JORDAN AS REPRESENTATIVE OF THE ESTATE OF JIMMIE JORDAN, BETTY JUDGE AS REPRESENTATIVE OF THE ESTATE OF CHARLES R. JUDGE, ROBERT KEYES, EDDIE F. KINNARD, KENNY J.**

LADNER AS REPRESENTATIVE OF THE ESTATE OF L.B. LADNER, JULIUS LYNUM, LONNIE R. MAXIE, JAMES R. MCCORMICK, JAMES K. MILLER, FRAZIER NASH, LEE BERTHA PENNINGTON AS REPRESENTATIVE OF THE ESTATE OF EUNICE T. PENNINGTON, JAMES W. SCOTT, RONALD G. SELLERS, ERNEST R. SMITH, JAMES B. SMITH, WILLIAM E. SMITH and DORMAN W. WHITTINGTON hereinafter referred to as Plaintiffs, and files this Original Complaint against JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM, JOHN M. O'QUINN & ASSOCIATES L.L.P., JOHN M. O'QUINN, P.C., JOHN M. O'QUINN LAW FIRM, PLLC., CHRISTIAN A. STEED, MICHAEL J. LOWENBERG, RICHARD N. LAMINACK, BUFFY MARTINES, THOMAS W. PIRTLE, PAUL DANZINGER, ROD R. DE LLANO, DANZIGER & DE LLANO, LLP, MARVIN SCHRAGER, ROBERT MUELLER, MUELLER & SCHRAGER, PC, STACIE F. TAYLOR, and ABEL MANJI hereinafter collectively referred to as Defendants, and would respectfully show as follows:

## I
## PLAINTIFFS

1.      FRANK BATES is an adult resident citizen of Alabama.

2.      RICHARD N. BROWN is an adult resident citizen of Mississippi.

3.      BRUCE D. COCHRAN is an adult resident citizen of Mississippi.

4.      ROSE MARY CRAWFORD AS REPRESENTATIVE OF THE ESTATE OF OTTO CRAWFORD, JR. is an adult resident citizen of Mississippi.

5.      WANDA PETERSON AS REPRESENTATIVE OF THE ESTATE OF BARNEY CUEVAS is an adult resident citizen of Mississippi.

6.      SAMMIE L. DAVIS is an adult resident citizen of Alabama.

7.      RICHARD U. EVANS is an adult resident citizen of Alabama.

8.      ROBERT L. EVANS is an adult resident citizen of Mississippi.

9.      KENNETH LAURE FIRTH is an adult resident citizen of Mississippi.

10.     WILLIE A. GALLOWAY is an adult resident citizen of Mississippi.

11.     OTIS L. GREER is an adult resident citizen of Alabama.

12.     WILBERT L. INGE, SR is an adult resident citizen of Alabama.

13.     JOE EARL JACKSON is an adult resident citizen of Alabama.

14.     TROY W. JACKSON is an adult resident citizen of Alabama.

15.     CHARLES M. JAMES is an adult resident citizen of Mississippi.

16.     ELISHEY O. JAMES is an adult resident citizen of Mississippi.

17.     JERREL JORDAN AS REPRESENTATIVE OF THE ESTATE OF JIMMIE

JORDAN is an adult resident citizen of Alabama.

18.     BETTY JUDGE AS REPRESENTATIVE OF THE ESTATE OF CHARLES R.

JUDGE is an adult resident citizen of Mississippi.

19.     ROBERT KEYS is an adult resident citizen of Mississippi.

20.     EDDIE F. KINNARD is an adult resident citizen of Mississippi.

21.     KENNY J. LADNER AS REPRESENTATIVE OF THE ESTATE OF L.B.

LADNER is an adult resident citizen of Mississippi.

22.     JULIUS LYNUM is an adult resident citizen of Alabama.

23.     LONNIE R. MAXIE is an adult resident citizen of Mississippi.

24.     JAMES R. MCCORMICK is an adult resident citizen of Mississippi.

25.     JAMES K. MILLER is an adult resident citizen of Mississippi.

26.     FRAZIER NASH is an adult resident citizen of Mississippi.

27.     LEE BERTHA PENNINGTON AS REPRESENTATIVE OF THE ESTATE OF EUNICE T. PENNINGTON is an adult resident citizen of Mississippi.

28.     JAMES W. SCOTT is an adult resident citizen of Mississippi.

29.     RONALD G. SELLERS is an adult resident citizen of Mississippi.

30.     ERNEST R. SMITH is an adult resident citizen of Mississippi.

31.     JAMES B. SMITH is an adult resident citizen of Mississippi.

32.     WILLIAM E. SMITH is an adult resident citizen of Mississippi.

33.     DORMAN W. WHITTINGTON is an adult resident citizen of Mississippi.

## II
## DEFENDANTS

1.     RICHARD N. LAMINACK is an individual practicing law in Texas and can be served with citation at his principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

2.     JOHN M. O'QUINN & ASSOCIATES, PLLC D/B/A THE O'QUINN LAW FIRM is a Professional Limited Liability Company formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 440 Louisiana Street, Suite 2300,  Houston, Texas 77002.

3.     JOHN M. O'QUINN & ASSOCIATES L.L.P. is a Limited Liability Partnership formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 440 Louisiana Street, Suite 2300,  Houston, Texas 77002.

4.     JOHN M. O'QUINN, P.C., is a Professional Corporation formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 440 Louisiana Street, Suite 2300, Houston, Texas 77002.

5.      JOHN M. O'QUINN LAW FIRM, PLLC is a Professional Limited Company formed and doing business in Texas and may be served with citation by serving its' managing partner, Christian Steed, at 440 Louisiana Street, Suite 2300,  Houston, Texas 77002.

6.      T. GERALD TREECE, AS INDEPENDENT EXECUTOR OF THE ESTATE OF JOHN M. O'QUINN, DECEASED, is the executor and representative of the Estate of John M. O'Quinn, deceased, and may be served by serving T. Gerald Treece at his principle place of business, 1303 San Jacinto Street, Houston, Texas 77002.

7.      CHRISTIAN A. STEED is an individual practicing law in Texas and can be served with citation at his principal place of business, The O'Quinn Law Firm, 2300 Lyric Centre Building, 440 Louisiana, Houston, Texas 77002.

8.      MICHAEL J. LOWENBERG is an individual practicing law in Texas and can be served with citation at his principal place of business, The O'Quinn Law Firm, 2300 Lyric Centre Building, 440 Louisiana, Houston, Texas 77002.

9.      BUFFY MARTINES is an individual practicing law in Texas and can be served with citation at her principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

10.      THOMAS W. PIRTLE is an individual practicing law in Texas and can be served with citation at his principal place of business, Laminack, Pirtle & Martines, 5020 Montrose Boulevard, 9th Floor, Houston, TX 77006-6533.

11.      PAUL DANZINGER is an individual practicing law in Texas an can be served with citation at his principal place of business, Danziger & De Llano, LLP, 440 Louisiana, Suite 1212, Houston, TX 77002.

12.     ROD R. DE LLANO is an individual practicing law in Texas an can be served with citation at his principal place of business, Danziger & De Llano, LLP, 440 Louisiana, Suite 1212, Houston, TX 77002.

13.     DANZIGER & DE LLANO, LLP is a Limited Liability Partnership formed and doing business in Texas that can be served with citation by serving one of its partners, either Paul Danziger or Rod R. De Llano, at their principle place of business, Danziger & De Llano, LLP, 440 Louisiana, Suite 1212, Houston, TX 77002.

14.     MARVIN SCHRAGER is an individual practicing law in Texas an can be served with citation at his principal place of business, Mueller & Schrager, 8540 Adirondack Trail, Apt. 24, Austin, Texas 78759.

15.     ROBERT MUELLER is an individual practicing law in Texas an can be served with citation at his principal place of business, Mueller & Schrager, 6907 Cat Creek Run, Austin, Texas 78731.

16.     MUELLER & SCHRAGER, PC is a domestic Professional Corporation that can be served by serving its registered agent, Marvin L. Schrager, at 8540 Adirondack Trail, Apt. 24, Austin, Texas 78759.

17.     STACIE F. TAYLOR is an individual practicing law in Alabama and can be served with citation at her principal place of business, Law Offices of Stacie Foster Taylor, 7182 Raleigh Blvd, Mobile, Alabama 36695-5506.

18.     ABEL MANJI is an individual practicing law in Texas and can be served with citation by serving his attorney, Jim Peacock at The Civil Justice Center, 112 E 4th Street, Houston, Texas  77007-2502.

### III
### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332, Diversity Jurisdiction, and the amount in controversy exceeds $100,000.00.

2.      Venue is proper in the Southern District of Texas – Corpus Christi Division because all, or a substantial part of the events or omissions giving rise to the claims occurred in this division and/or this is the judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought. Specifically, this case arises out of Defendants' gross malfeasance and breach of fiduciary duty while representing Plaintiffs in Cause No. 2:03-cv-00533; *In re Silica Litigation*, Multi-District Litigation 1553, filed directly in this Court.

### IV
### FACTS & ALLEGATIONS

1.      Plaintiffs have been found, by medical professionals hand selected by The O'Quinn Law Firm, to have silicosis. Thus, pursuant to the diagnosis made by the medical professionals selected by The O'Quinn Law Firm, Plaintiffs have silicosis, and thus, Plaintiffs allege the following facts and causes of action.

2.      This case arises out of the horrific and unfortunate malfeasance committed by The O'Quinn Law Firm, its' attorneys and referring lawyers during the representation of thousands of clients who were diagnosed with the incurable and potentially fatal disease of silicosis. For over ten years, The O'Quinn Law Firm ("O'Quinn" or the "Firm") at the leadership of its principle attorneys, John M. O'Quinn ("Mr. O'Quinn") and Richard Laminack in addition to the medical experts hand-selected by the Firm, lead clients, the judicial system, defendants in the underlying case and opposing counsel to believe that its' clients had silicosis in order to "fuel a silicosis

litigation machine" and generate millions of dollars in attorneys fees and expenses. At the end of the day, Mr. O'Quinn, Mr. Laminack, the Firm and its' attorneys placed their interests and the interests of the screening companies involved above those of its clients. This is the sad reality of O'Quinn's approach to mass-tort litigation and this is the story of the residual victims of that approach, their clients.

3.      O'Quinn represented approximately three-thousand (3000) clients who were occupationally exposed to silica-containing products and materials and diagnosed as having silica related diseases (hereinafter the "Silicosis Clients")[1] against numerous manufacturers and distributors of silica related products, materials and/or protective equipment (hereinafter the "Silicosis Defendants"). Plaintiffs, like other Silicosis Clients, were solicited by attorneys and other individuals, law firms, or screening companies to undergo medical screening to determine if they had silicosis. Plaintiffs were then solicited to enter into contracts with law firms who promised to litigate their silicosis claims against the Silicosis Defendants. These law firms subsequently referred Plaintiffs to O'Quinn. As much as 98% of O'Quinn's silicosis docket came from referring law firms. The referring law firms included Danziger & De Llano, LLP, Paul Danzinger, Rod De Llano ("Danziger"), Marvin Schrager, Robert Mueller, Mueller & Schrager, P.C., ("Mueller"), and Stacie F. Taylor ("Taylor"), among others, (collectively sometimes the "referring lawyers") all of which remained jointly responsible for any wrongful acts committed by O'Quinn or its attorneys.[2]

---

[1] Plaintiffs in this case are part of the group of "Silicosis Clients."
[2] *See* Texas Disciplinary Rule of Professional Conduct 1.04 (f) which states that "A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if … the division is … made between lawyers who assume joint responsibility for the representation…"

4.      Plaintiffs initially signed contingency fee contracts with either one of the referring lawyers or signed the initial contract directly with O'Quinn and/or O'Quinn's related entities.[3] Still, all (or a majority of) Plaintiffs ultimately signed contracts directly with O'Quinn. The contract signed by Plaintiffs with O'Quinn hired the firm on a contingency fee basis and issued the firm a Power of Attorney ("POA") to represent them in any and all claims against the Silicosis Defendants. Various Plaintiffs executed the POAs with O'Quinn between 2001 and 2003.

5.      At various times in the early 2000s, O'Quinn filed lawsuits against numerous Silicosis Defendants. Of their three-thousand (3000) Silicosis Clients, roughly one thousand (1000) of these Silicosis Clients' cases were filed in Texas state court.  The majority of the other cases were filed in Mississippi and these cases were transferred to the Mississippi Multi-District Litigation No. 1553 ("MDL"). However, Plaintiffs in this lawsuit are of the group known as the "Alexander" plaintiffs that had their underlying silicosis lawsuits filed directly in this Court by O'Quinn on or about December 12, 2003.

6.      Among the attorneys working on the Silicosis docket at O'Quinn were Mr. O'Quinn, Richard N. Laminack ("Laminack"), Thomas W. Pirtle ("Pirtle"), and Buffy Martines ("Martines").

7.      Early on in the litigation, and sometime even prior to the POA being signed, O'Quinn, Laminack, Pirtle, and/or Martines all under the direction and supervision of Mr. O'Quinn, either personally or through medical screening companies, would advise the Silicosis Clients, including Plaintiffs, to travel to various places throughout Texas to undergo medical exams by screening companies and medical professionals hand-picked by the Firm and its

---

[3] The O'Quinn Law Firm has also been known as John M. O'Quinn & Associates, PLLC and/or O'Quinn, Laminack & Pirtle, among other names.

attorneys. These screening companies included N&M, Inc (hereinafter "N&M") and Repertory Services, Inc. (hereinafter "RSI"), who had mobile screening trailers that would travel to various locations to perform the screenings which often occurred in the parking lot of hotels, strip malls or restaurants.

8.      In January of 2002, attorneys at O'Quinn received a memorandum from N&M, outlining the "list of charges [the attorneys had] requested." The charges read:

| | |
|---|---|
| Chest x-ray | $35 |
| B-read | $45 |
| Full exam medicals with PFT | $300 |
| **Full exam medicals with PFT (N&M refers)** | **$650** |
| Re-reads | $35 |

According to the memo, if N&M, a non-lawyer, referred the client to O'Quinn, the Firm would pay N&M an additional $350 referral fee for the case. Such conduct amounts to no less than barratry and is a violation of the Texas Penal Code and TX Disciplinary Rules of Professional Conduct. This occurred on numerous occasions and several Plaintiffs were charged the entire $650 to $750 as expenses in their case. Thus, not only did the Firm pay N&M an extra $350 to $450 to "buy" Plaintiffs as clients, but the Firm then turned around and billed the extra $350 to $450 to Plaintiffs as expenses in their case. Not only this, but the Firm would lure Plaintiffs into the screenings with advertisements for "Free" silicosis screenings, but then turn around and bill the entire amount of the screening, including the referral fee paid to N&M, to Plaintiffs. Although highly unethical, it was a win-win for the Firm.

10.      Additionally, pursuant to Rule 7.06 of the Texas Disciplinary Rules of Professional Conduct, the Firm and its lawyers were mandated to immediately withdraw from the representation of every client that was referred to them by N&M in violation of Rule 7.03. Therefore, all fees and expenses obtained from these clients were obtained illegally and thus,

should be disgorged pursuant to the doctrine that one should not profit or gain from their own wrong doing.

11.     Under the direction of the Firm, N&M and/or RTS and its staff would often perform the initial X-Ray and Pulmonary Function Tests ("PFTs") on Plaintiffs, both of which were required to make a diagnosis of silicosis. O'Quinn and its staff would collect the occupational and exposure histories from the Plaintiffs required to make the silicosis diagnoses. All of this information would then be provided to the medical professionals hand selected by the Firm and its attorneys and the referral lawyers including, initially, Dr. Ray Harron, Dr. Andrew Harron, Phillip H. Lucas and Dr. Barry Levy, among others. These medical professionals provided the Firm with medical reports and opinions diagnosing Plaintiffs with silicosis and various silicosis related diseases including Lupus, Tuberculosis, Rheumatoid Arthritis, Scleroderma or even Lung Cancer. Over the course of the silica litigation, the Firm paid over $1.7 million to Dr. Harron and N&M for their medical screenings, reports and referrals.

12.     O'Quinn used these reports in the litigation against the Silicosis Defendants, continuously and vehemently representing to the courts in the underlying case (including this very Court) that Plaintiffs had all been diagnosed with silicosis and were suffering injury. In fact, Laminack, O'Quinn's managing partner of the mass-tort division, testified, under oath, that he "would never knowingly bring a silicosis claim on behalf of an individual that does not have the fundamental proof of such a claim."[4] Further, Mr. Laminack testified on the record in this very

---

[4] *See* STAFF OF H. COMM. ON ENERGY & COMMERCE, MEMORANDUM TO THE SUBCOMM. ON OVERSIGHT AND INVESTIGATIONS: 109TH CONG., OVERSIGHT AND INVESTIGATIONS HEARINGS: ―THE SILICOSIS STORY: MASS TORT SCREENING AND THE PUBLIC HEALTH‖ FOURTH DAY OF HEARINGS (Comm. Print July 26, 2006) at 402.

Court that "these *Alexandar* plaintiffs have good, solid Daubert-proof diagnosis of silicosis. They've got it."[5]

13.     After filing the silicosis lawsuits, O'Quinn utilized Dr. Harron's reports to obtain "global settlements" out of some of the underlying defendants. In fact, by January of 2004, O'Quinn had entered into global settlements with Moldex, 3M, Air Liquide, Halliburton and Clemtex which, if properly processed, totaled over $55 million dollars. The settlements were typically based off of various factors including the clients' exposure history with each Silicosis Defendants' product, the clients' lung function to radiographic reading (or "ILO reading"), and whether the client had been diagnosed with any diseases linked to silicosis such as Lupus, Tuberculosis, Rheumatoid Arthritis, Lung Cancer, or Scleroderma, just to name a few.

14.     Although O'Quinn began receiving the settlement funds for different Silicosis Defendants as early as 2002, O'Quinn and its attorneys wrongfully retained the settlement proceeds for its own use. O'Quinn, with no objection from the referring lawyers, failed to distribute the funds in a timely manner or apply the proceeds to the expenses, thus forcing the Silicosis Clients, including Plaintiffs, to incur unnecessary interest and unnecessary costs for future expenses had the funds been distributed timely.   For example, O'Quinn received settlement money and negotiated settlements from a number of Silicosis Defendants in early 2003. However, by February 2004, Defendants still had not disbursed any of the settlement proceeds to Plaintiffs. Even more egregious, whenever various Silicosis Clients would call O'Quinn to inquire about their settlements, the staff, including Laminack, Steed and others, under the direction of Mr. O'Quinn would, directly or indirectly, make misrepresentations concerning the clients' settlements rather than tell the clients the truth and issuing a disbursement. Indeed, despite having clients' settlements in O'Quinn's possession for "many

---

[5] *See* Cause No. MDL-03-1553, August 22, 2005 Status Conference Transcript, pg. 64.

many months", one of the attorneys, Molter, requested permission to disburse partial funds to the clients because she was simply "running out of things to tell these folks." It is obvious that the Firm under the direction of Mr. O'Quinn, Laminack, Steed, Pirtle, Martines and any other attorney managing or working the silicosis docket, held Plaintiffs' funds hostage in order to pay future expenses and interest to the benefit of the Firm and to the detriment of Plaintiffs.

15.    Another serious issue with the representation related to the deduction of "general expenses". Regardless of the fact that many of the Silicosis Clients, including numerous Plaintiffs herein, did not authorize, the firm deducted general expense from the clients. A few of the Plaintiffs signed contracts directly with O'Quinn which mentioned nothing about "Silica General Expenses." Nonetheless, O'Quinn charged Plaintiffs an arbitrary 3.0 % of these general expenses and forced the Plaintiffs to sign affidavits *subsequently* agreeing to have "Silica General Expenses" and the arbitrary 3.0% pro-rata portion of these general expenses deducted from their settlements prior to O'Quinn releasing any of their settlement funds. Thus, O'Quinn and its attorneys held Plaintiffs' settlement funds hostage unless they signed a new agreement consenting to a 3.0% pro-rata general expense charge.

16.    Realizing they needed to disclose the "Silica General Expenses" charge in the contract, O'Quinn changed the language of their subsequent silicosis agreements to include disclosure of such the deduction of general expenses. Thereafter, many Plaintiffs signed agreements with O'Quinn containing the new language. However, prior to signing the agreements with O'Quinn many of the Plaintiffs had already entered into contingency fee agreements with the referring lawyers, including Danzinger and Taylor. The prior agreements entered into with the referring attorneys mentioned nothing about the general expenses. Still, the referring lawyers, including Danzinger and Taylor, as well as O'Quinn, had Plaintiffs sign the

new *subsequent* agreement with O'Quinn which materially altered the terms of the prior agreement and contained the "general expense" language. Neither O'Quinn nor the referring lawyers disclosed the pros and cons or the advantages and disadvantages of this new subsequent agreement. Furthermore, Plaintiffs were never advised to seek outside counsel prior to entering into these new agreements, nor was the new subsequent agreements fair and reasonable to Plaintiffs.

17.    In addition, a "huge number" of client case specific charges were being billed to Silicosis General simply because "employees didn't take time to look up client case numbers." In the same regard, O'Quinn, under the management of Mr. O'Quinn, Laminack and Pirtle permitted numerous charges to be billed to Silicosis General for work done in the Texas State cases that had nothing to do with the Mississippi MDL. Thus, Plaintiffs, who were never part of the Texas State litigation, were charged expenses for their cases that they never actually incurred. These excess charges were never disclosed to Plaintiffs and Plaintiffs were never reimbursed for these excess charges.

18.    By 2003 the litigation expenses for O'Quinn's silicosis docket was "out of control." Just two years into the litigation, expenses for the 3000 clients amounted to over $10 million dollars. $1.7 million was paid to the referral lawyers for screening cases and hundreds of thousands went to N&M for screening and referring O'Quinn the cases. Rather than spend money on securing evidence of liability, O'Quinn, led by Mr. O'Quinn, Laminack and  Pirtle, squandered hundreds of thousands of dollars through frivolous conduct. The Firm would bill its' overhead as "expenses" to the clients. In just one instance, the Firm spent over $60,000.00 on an "elaborate" database to manage the silicosis docket that not one employee ever put a scrap of information into other than general contact information already contained in other databases.

Additionally, employee travel expenses were overly excessive. There were dinner tabs for $1,000.00, $100.00 bottles of wine and liquors, and expensive cigars, all of which were billed to the clients, including Plaintiffs and charged to Silicosis General. Moreover, instead of flying coach, employees of the Firm would unnecessarily upgrade to first-class and simply bill the clients, including Plaintiffs. In fact, Mr. O'Quinn billed flights on his private jet to the Silicosis General file.

19.      Additionally, the Firm's attorneys, all under the management of Mr. O'Quinn and Laminack unreasonably increased the expenses in the silicosis cases through carelessness and disregard. These attorneys hired medical experts and paid up front fees of $20,000.00 or more to render an expert report only to find out that the experts were not qualified experts in the first place or that they were not the type of experts that the Silicosis Defendants required in order to settle. O'Quinn still billed these charges to Plaintiffs and other Silicosis Clients. Further, the Firm incurred "thousands and thousands of dollars" in unnecessary hotel and meeting room costs caused by the Firm's employees scheduling depositions for plaintiffs and fact witnesses and then canceling said depositions because the Firm's employees simply did not want to attend. Mr. O'Quinn and Mr. Laminack permitted such conduct to occur. More egregious however is that O'Quinn and its attorneys would (on numerous occasions) bill two-to-three day trips as expenses to cover a hearing that lasted only a few hours. All these charges were billed to Silicosis General of which Plaintiffs had to pay their arbitrary, non authorized 3.0% share.

20.      Aside from the expense related errors mentioned above, the Firm at the hands of Laminack, Pirtle and Martines, under the management of Mr. O'Quinn, committed numerous errors while processing a number of the settlements with the Silicosis Defendants. Due to O'Quinn's delay, many clients who had both asbestosis and silicosis cases where denied their

higher silicosis claim with defendants like 3M and Halliburton because their asbestosis attorney would settle the asbestosis claim that would also release any pending silicosis claim. This occurred because of O'Quinn's unreasonable delay in processing the settlements and because its attorneys wholly failed to communicate with the asbestosis attorneys, investigate the clients other competing claims or otherwise ensure that their clients would receive the higher claims.

21. In addition, the Firm improperly, and in violation of the rules governing professional conduct, failed to fully investigate and assess individual claims and entered into an "aggregate" or "global" settlements with 3M for approximately $26 million and then intimidated or coerced Plaintiffs into the settlement. This was done even though the Firm and the attorneys therein knew that the way they were handling the aggregate settlements were prohibited under *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999). The Firm and its' attorneys made no individual negotiations on behalf of the Plaintiffs and, even knowing potential "*Arce* issues" where present, signed off on the settlement without following the dictates of Arce.

22. Further, the Firm continuously permitted Plaintiffs' claims to be wrongfully dismissed against a number of Silica Defendants. In 2004, the Firm and its attorneys, including Laminack, were aware that numerous Silicosis Clients' cases had been wrongfully dismissed before releases had been signed or settlements had been paid. Yet, the Firm and its employees chalked them off as a loss and did not "waste time checking every lawsuit [they] filed against the Court records to see which cases have or have not been dismissed." Instead, they figured "[w]hat's done is done." These wrongful dismissals were never disclosed to the effected Silicosis Clients, which may include Plaintiffs.

23 Moreover, numerous Silicosis Defendants filed motions for summary judgment which were easily controverted. However, the Firm and its attorneys wholly failed to respond to

these motions and instead simply dismissed the viable cases against those Silicosis Defendants or simply did not file a response because it was too bothersome.

24.     Furthermore, the Firm failed to process and/or finalize settlement agreements. In his February 25, 2005 resignation letter to Mr. Laminack, Mr. Gibson uttered the inevitable truth affecting the Firm's silicosis docket: "[w]e are going to lose every settlement we have made because we won't process them."  This is exactly what happened to the Firm's settlements with silica defendants, Sanstorm, Moldex and many others. The vast majority, if not all, of the Plaintiffs were all entitled to settlement proceeds with Sandstorm (also known as Air Liquid). On November 7, 2002, Pirtle, on behalf of the Firm, entered into a Rule 11 Agreement with Sanstorm.  The settlement with Sanstorm was for approximately $5,250,000.00.  By February 25, 2005, Gibson informed Laminack that "Sandstorm will stand by their settlement if we send it out now."  However, the paperwork never went out and the clients never received any settlement proceeds from Sanstorm. Had the Firm simply enforced the Rule 11 Agreement and processed the settlement, Plaintiffs would have obtained their portion of the settlement.

25.     The situation with underlying silica defendant Moldex was settlement neglect déjà vu. The majority of Plaintiffs were entitled to proceeds from the Moldex settlement. On November 1, 2003, Moldex and the Firm entered into a settlement agreement.  The Firm had settled its claims with Moldex for approximately $2,250,000.00.  Moldex was willing to pay the firm for the clients it had releases for even though the quota had not been met.  Thus, all the Firm had to do was send the releases and the paperwork to Plaintiffs to be filled out and then forward the releases to Moldex for payment. In many instances the Firm sent Intervenors releases which were filled out and sent back to the Firm.  However, attorneys at the Firm never timely processed or enforced the settlement with Moldex during 2003 or 2004.  When Mr. Manji joined the Firm

he attempted to resend the Moldex releases but was told that because the doctors used in the clients' medical reports had been discredited in the MDL's *Daubert* proceedings, they were not going to proceed with the settlement.  However, had the Firm simply processed the Moldex settlement in a timely manner and sent the releases to Moldex, Plaintiffs would have received these settlement proceeds.

26.     The above claims, settlements and/or bankruptcies are likely not the only claims/settlements that Plaintiffs missed out on due to the Firm's delay in processing and litigating their claims. Thus, Plaintiffs seek any and all claims and monies they were entitled to and would have received but for Defendants' delay.

27.     Furthermore, the Firm and its attorneys failed to ensure that those Plaintiffs with Lupus, Tuberculosis, Rheumatoid Arthritis, Lung Cancer, or Scleroderma (the "Big-5" diseases), received the proper settlement amounts from the settling Silicosis Defendants. For instance, Silicosis Defendants Halliburton, 3M and Moldex would pay Plaintiffs higher settlement amounts if they had a medical report linking one of the foregoing Big-5 diseases to silicosis. Many Plaintiffs had such reports. However, the Firm and its attorneys failed to ensure that such reports were submitted and that Plaintiffs received the appropriate (and much greater) settlement amounts.

28.     By way of another example, approximately 238 Silicosis Clients, including some of the Plaintiffs herein, had their claims against Halliburton denied because the Firm failed to file them or filed them in the wrong manner by the December 21st deadline, a deadline set by the bankruptcy court. These Plaintiffs were never advised that their Halliburton claims had been denied due to the Firm's failures. Rather, the Firm concealed this fact from Plaintiffs to protect its' own interests.

29.    In early 2005 this Court, in the MDL, conducted various hearings on the reliability of the doctors used by O'Quinn and also considered the underlying defendants' Motion for Sanctions. On June 30, 2005 this Court issued the following opinion:

> Defendants' Motions for Sanctions will be GRANTED as to *Alexander*. The law firm of O'Quinn, Laminack & Pirtle ("O'Quinn") has multiplied the proceedings unreasonably and vexatiously, and will be required to satisfy personally Alexander's proportionate share (*i.e.*, one percent) of Defendants' reasonably incurred costs, expenses and attorneys' fees for the Daubert hearings conducted on February 16-18, 2005.[6]

After O'Quinn was sanctioned by this Court for their **own** wrongful conduct, they simply billed these sanctions to the client as "expenses". In fact, the line-item on the expense report for each client was entitled "Alexander, et al. Sanctions." Apparently, O'Quinn and its managing lawyers believed that these sanctions reasonably advanced Plaintiffs' cases.

30.    O'Quinn's delay, coupled with this Court's findings of O'Quinn in the *Daubert* hearings, caused many of the referring attorneys to withdraw from the Plaintiffs' silica cases. For instance, the Mississippi referring firm of Grenfell, Sledge & Stephens ("Greenfell Sledge"), who referred a number of Plaintiffs' cases to O'Quinn, withdrew from the cases in 2005 or 2006 and refunded all the expenses they had once charged, along with any attorneys' fees they had collected, back to O'Quinn. This occurred in 2005 to 2006. O'Quinn themselves later withdrew from Plaintiffs' silicosis cases in 2006/2007. Rather than immediately refund the Greenfeld Sledge expenses and attorneys fees to the Plaintiffs, O'Quinn wrongfully retained this money for over six years, never disclosing to Plaintiffs that the excess expenses were returned and in their possession. It was not until Defendants got word that the undersigned counsel had contacted Plaintiffs to inform them of their potential claims against O'Quinn.

---

[6] *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 567.

31.     But the Greenfell Sledge refund was not the only instance where O'Quinn attempted to convert Plaintiffs' funds to their own use. In the bankruptcy proceedings with Halliburton, the bankruptcy court withheld a small portion of each claimants' settlement to administer the claims. Although the Firm received these remaining funds from the Halliburton bankruptcy proceedings in 2006 and 2007, the Firm never disbursed these funds to Plaintiffs. Rather, the Firm purposefully held onto the funds for its own use. Again, it was not until Defendants got word that the undersigned counsel had contacted Plaintiffs that the Firm began refunding their money to the Plaintiffs as late as October of 2012 after Plaintiff's were represented by the undersigned.

32.     After the *Daubert* hearings in the MDL took place, Gibson, Laminack, Pirtle, Molter and Martines left the Firm. Thereafter, O'Quinn hired Abel Manji ("Manji") to take over the silicosis docket. Although they knew of the issues surrounding the silicosis docket, neither Laminack nor Mr. O'Quinn advised Manji of the deplorable conduct committed by them and the Firm as outlined above. Manji discovered the issues over the proceeding few years of his employment with apparently no help from his colleges or current and former members of the Firm by digging through various boxes that were randomly and anonymously, left outside  his office door over the course of seven years.

33.     By deception and purposeful concealment, the N&M referral fees went under the radar for several years until Manji discovered the issue in June or July of 2008. At the time he first discovered the issue he thought they were just overcharges. In August of 2008, Manji had a meeting with Christian Steed ("Steed"), the Firm's managing attorney, about the overcharges/referral fees. At first, Steed was very concerned about the issue.  Manji looked into the issue further and by early 2009 found that everything he was told by Patricia Hilliard, a

former employee of the Firm, was true – that is, former employees of the Firm, Mr. O'Quinn, Laminack, and Pirtle – were buying cases from N&M and its owner Heath Mason. In the summer of 2009, Mr. Manji had confirmed this issue and informed Mr. Steed and the Firm's counsel of how the Firm was buying cases from non-lawyers. By October of 2009 Mr. Steed had not permitted Manji to send a letter out advising the clients of the referral fees and overcharges. In December of 2009, Manji brought the issue to Steed's attention again but nothing happened. Finally, in January of 2010, Mr. Steed put Manji in contact with Professor Robert Schuwerk to work on drafting a disclosure letter to the clients. Mr. Schuwerk approved Mr. Manji's letter that same month but the letter that Mr. Manji wrote, which was in plain language the clients could understand, never went out. Instead, in July of 2010, the Firm sent out a completely different "disclosure" letter informing the clients of the N&M issue. The letter, ultimately signed by Steed, was so inaccurate and inadequate that Manji refused to sign off on it. This is because the letter was so convoluted that even Manji, a highly-skilled silicosis attorney, could "barely understand what it says." As written, Mr. Manji expressed that "none of [his] clients would even be able to understand [the] letter…" and that the "[w]hole letter [was] confusing to [him]." Moreover, the letter contained numerous misrepresentations. For instance, while the letter stated "we recently reviewed", Mr. Manji emphasized that the "issue is not recent. It happened in 2002 … I told them in 2008."

34.    Moreover, and even more egregious than the above, after a group of former Texas silicosis clients brought suit against O'Quinn for the foregoing conduct, Steed and Michael J. Lowenberg ("Lowenberg") and apparently others connected to the Firm set about a course of conduct to destroy, shred and alter documents contained in all of the Silicosis Clients' files, including Plaintiffs. To conduct this enormous task, the Firm hired a temp service of

approximately twenty people comprised of both lawyers and non-lawyers to alter the clients'
files.  During this process, Manji witnessed "thousands" of documents being taken out of the
silicosis clients' files and "thrown in the trash can" and "shredded" after the Texas litigation had
ensued.  The document shredding and altering of the clients' files occurred day after day for
several months over Manji's strong objection.   Manji strongly objected to Steed and other
members of the Firm, including Dean T. Gerald Treece, the current Executor of Mr. O'Quinn's
estate, however, the spoliation of client files continued over Manji's objections to the contrary.

## V
## CAUSES OF ACTION

1.     Based on the above, it has become necessary to bring this suit to collect a legal debt
of money damages owing to Plaintiffs due to the conduct described herein. The conduct
described herein constitutes negligence, negligent misrepresentation, breach of fiduciary duty,
breach of contract, fraud, constructive fraud, fraud by non-disclosure, misapplication of fiduciary
property and violates the Texas Deceptive Trade Practices Act. Defendants Mr. O'Quinn, Mr.
Laminack, and Mr. Steed's actions also constitute negligent supervision.

### A.     NEGLIGENCE

2.     In addition to the allegations and instances of malfeasance outlined above, the
following errors and/or omissions constitutes negligence: (1) Failure to diligently represent
Plaintiffs in their Silicosis related claims; (2) Failure to preserve Plaintiffs claims, rights and
defenses in their Silicosis related claims; (3) Failure to protect Plaintiffs interests in their
Silicosis related claims; (4) Failing to obtain the proper experts and/or submit the proper expert
reports or information on behalf of Plaintiffs to preserve his or her claims; (5) Failure to properly
and timely obtain and disburse settlement proceeds from the underlying Silicosis Defendants; (6)
Failure to keep accurate billing and expense records; (7) Failure to properly and accurately

deduct expenses; (8) Failure to properly inform Plaintiffs regarding the material facts of their case; (9) Failure to properly disclose material facts to Plaintiffs, (10) Failure to property name viable underlying Defendants; and (11) Failure to property comply with Orders of the Court.

3.      Of course, nothing Plaintiffs did, or failed to do, caused or in any way contributed to cause the occurrences that resulted in losses and damages to Plaintiffs.  On the contrary, the Defendants fell below the standard of care for attorneys practicing law in Texas, and thus, the Firm and its attorneys' conduct was a proximate and/or producing cause of Plaintiffs' losses and damages.

4.      Moreover, at all times material to the causes of action asserted herein, the Firm and its attorneys' conduct were regulated by the Texas Disciplinary Rules of Professional Conduct. The Firm and its attorneys' conduct, all or singularly, constitutes a violation of the following sections of the Texas Disciplinary Rules of Professional Conduct:

### TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT

### RULE 1.01        COMPETENT & DILIGENT REPRESENTATION

(a) A lawyer shall not accept or continue employment in a legal matter which the lawyer knows or should know is beyond the lawyer's competence, unless:

> (1) another lawyer who is competent to handle the matter is, with the prior informed consent of the client, associated in the matter; or

> (2) the advice or assistance of the lawyer is reasonably required in an emergency and the lawyer limits the advice and assistance to that which is reasonably necessary in the circumstances.

(b) In representing a client, a lawyer shall not:

> (1) neglect a legal matter entrusted to the lawyer; or

> (2) frequently fail to carry out completely the obligations that the lawyer owes to a client or clients.

**RULE 1.03     COMMUNICATION**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**RULE 1.04     FEES**

(a) A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.

(c) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

**RULE 1.08     CONFLICT OF INTEREST**

(a)  A lawyer shall not enter into a business transaction with a client unless:

    (1) the transaction and terms on which the lawyer acquires the interst are fair and reasonable to the client and are fully disclosed in a manner which can be reasonably understood by the client;

    (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

    (3) the client consents in writing thereto.

**RULE 1.14     SAFEKEEPING PROPERTY**

(a) A lawyer shall hold funds and other property belonging in whole or in part to clients … that are in a lawyer's possession in connection with a representation separate from the lawyer's own property. Such funds shall be kept in a separate account, designated as a trust or escrow account, maintained in the state where the lawyers office is situated, … Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person…a lawyer shall promptly deliver to the client … any funds … that the client … is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law.

**RULE 1.15    DECLINING OR TERMINATING REPRESENTATION**

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned.  The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.

**RULE 2.01    ADVISOR**

In advising or otherwise representing a client, a lawyer shall exercise independent professional judgment and render candid advice.

**RULE 3.04    FAIRNESS IN ADJUDICATORY PROCEEDINGS**

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence; in atincipation of a dispute unlawfully alter, destroy or conceal a document or other material that a competent lawyer would believe has potential or actual evidentiary value; or counsel or assist another person to do any such act.

**RULE 4.01    TRUTHFULNESS IN STATEMENTS TO OTHERS**

In the course of representing a client a lawyer shall not knowingly:

(a) make a flase statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client.

### RULE 4.02   COMMUNICATION WITH ONE REPRESENTED BY COUNSEL

(a) In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(b) In representing a client a lawyer shall not communicate or cause another to communicate about the subject of representation with a person or organization a lawyer knows to be employed or retained for the purpose of conferring with or advising another lawyer about the subject of the representation, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

### RULE 7.03   PROHIBITED SOLICITATIONS & PAYMENTS

(b)  A lawyer shall not pay, give, or offer to pay or give anything of value to a person not licensed to practice law for soliciting prospective clients for, or referring clients or prospective clients to, any lawyer or firm…

…

(d) A lawyer shall not enter into an agreement for, charge for, or collect a fee for professional employment obtained in violation of Rule 7.03(a), (b), or (c).

(e) A lawyer shall not participate with or accept referrals from a lawyer referral service unless the lawyer knows or reasonably believes that the lawyer referral service meets the requirements of Occupational Code Title 5, Subtitle B, Chapter 952.

### RULE 7.06   PROHIBITED EMPLOYMENT

(b)  A lawyer shall not accept or continue employment in a matter when that employment was procured by conduct prohibited by any of Rules 7.01 through 7.05, 8.04(a)(2), or 8.04(a)(9), engaged in by that lawyer personally or by any other person whom the lawyer ordered, encouraged, or knowingly permitted to engage in such conduct.

**RULE 8.04    MISCONDUCT**

(a) A lawyer shall not:

> (1) violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

> (2) commit a serious crime , or commit any other criminal act that reflects adversely on the lawyers honesty, trustworthiness or fitness as a lawyer in other respects;

> (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

5.  The requirements of these rules above establish public policy against such conduct and their violation constitutes negligence as that term is understood in legal malpractice when supported by the expert opinion of an attorney familiar with the standard of care defined by these rules.  Moreover, a violation of the Texas Disciplinary Rules of Professional Conduct constitutes constructive fraud as that term is understood in law.  Furthermore a Violation of Texas Disciplinary Rules of Professional Conduct constitutes a "clear" and "serious" Breach of Fiduciary Duty.

**B.    GROSS NEGLIGENCE**

6.  The acts and omissions of Defendants as described herein constitutes gross negligence for which Plaintiffs now sue.  Defendants owed Plaintiffs a duty to render legal services with the care, skill and diligence of an attorney of ordinary and reasonable skill and knowledge.  Defendants failed to perform as attorneys of ordinary and reasonable prudence.  Moreover, however, Defendants wholly failed to uphold these duties.  Instead, Defendants chose to treat Plaintiffs with an entire want of care, such that Defendants' actions constitute an actual conscious disregard to the rights, welfare and safety of

Plaintiffs.   Defendants' gross negligence proximately resulted in legal damages, for which Plaintiffs sue.

### C.   BREACH OF FIDUCIARY DUTY

7.      An attorney client relationship existed between Plaintiffs, O'Quinn and the Firm's attorneys.  Thus, the Firm, Mr. O'Quinn, Laminack, Pirtle, Martines,  Lowenberg and Steed, as well as the referring firms Danzinger and Taylor, owed Plaintiffs various fiduciary duties as a matter of law, including: (1) Duty to act with loyalty and utmost good faith and fair dealing; (2) Duty to act with absolute perfect candor, openness, and honesty, without any deception or concealment, no matter how slight; (3) Duty to be strictly honest about fee agreements and to refrain from self-dealing; (4) Duty to fully and fairly disclose to all Plaintiffs all matters material to the representation; (5) Duty to turn over funds belonging to Plaintiffs timely and promptly; (6) Duty to follow Plaintiffs' instructions; (7) Duty to make full and fair disclosure of the terms of a proposed settlement to Plaintiffs; (8) Duty to place the Plaintiffs' interests ahead of Defendants interests.

8.      The Firm, Mr. O'Quinn and other lawyers at the Firm intentionally breached these fiduciary duties as set out above. Specifically, these attorneys placed their own interests above those of Plaintiffs. This was accomplished by, among other things, (1) failing to timely distribute settlement proceeds; (2) charging excessive and/or unnecessary expenses; (3) charging Plaintiffs general case expenses for those expenses relating to *other* Silicosis Clients cases or cases relating to the Texas litigation rather than specifically to Plaintiffs; (4) failing to notify or disclose to Plaintiffs "problems" or "issues" that arose during the representation, including the disallowance of their settlements or bankruptcy claims; (5) holding settlements hostage unless clients agreed to pay a 3.0% pro-rata share of the general expenses; (6) holding settlement funds to pay future

expenses instead of timely distributing settlement funds to clients; (7) entering into new subsequent contracts with Plaintiffs permitting O'Quinn to deduct silicosis general expenses without advising Plaintiffs of the pros and cons, advantages, disadvantages, implications and nature of such subsequent agreement or advising them to seek outside counsel even when this new subsequent agreement was not fair and/or reasonable to Plaintiffs; (8) failing to withdraw from the representation of Plaintiff's as mandated by the Texas Disciplinary Rules of Professional Conduct; (9) deducting fees and expenses from Plaintiffs settlements after the Firm withdrew from representing Plaintiffs; (10) soliciting business through a lay intermediary; (11) entering into aggregate or global settlements without any individual assessment of claims; (12) coercing Plaintiffs into the settlements; (13) destroying and altering Plaintiffs' litigation files, including documents which may show their misconduct, after the Texas litigation had ensued and knowing that litigation involving the Mississippi MDL would may also ensue and (14) contacting represented clients outside their current councils purview even after being admonished not to contact the undersigned clients. The breaches described herein proximately caused Plaintiffs' damages for which they now sue.

### D.   BREACH OF CONTRACT

9.      The acts and omissions of the Firm as described above constitute breach of contract, for which Plaintiffs now sue.  The contingency fee contracts entered into between the Firm and some Plaintiffs did not allow for the deduction of Silica General Expenses. Additionally, the initial contracts signed by Plaintiffs with the referring law firms, primarily Danzinger and Taylor, did not allow for the deduction of common or general expenses. Moreover, none of the contracts permited O'Quinn to deduct an arbitrary 3.0% pro-rata share of the General Expenses from Plaintiffs' settlements. Thus, the Firm breached its contract with

Plaintiffs by charging Plaintiffs for Silica General Expenses when the contracts never permitted the Firm to do so and by charging Plaintiffs an arbitrary 3.0% pro-rata portion of General Expenses, which was also never agreed to.

10.     Moreover, the Firm breached its contract with all Plaintiffs by charging unnecessary and/or excessive expenses and charging Plaintiffs individually for expenses relating to *other* Silicosis Clients cases, and/or cases relating to the Texas litigation which should not have been charged to Plaintiffs. The Firm also breached its contract with Plaintiffs by charging fees and expenses from settlements. The Firm's breaches of contract resulted in legal damages to Plaintiffs and/or an improper benefit to the Firm for which Plaintiffs now sue.

### E.   VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

11.     Pursuant to *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1998), an express misrepresentation constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion, and thus violates Section 17.49(c)(3) of the Texas Deceptive Trade Practices Act ("DTPA"). In this same regard, an attorney can be held liable to his client if he violates Section 17.49(c) (3) of the DTPA by engaging in an unconscionable action or course of action.

12.     Plaintiffs are consumers under the DTPA because Plaintiffs acquired goods or services from the Firm and the Firm's attorneys.  The Firm and these attorneys violated the DTPA because they engaged in false, misleading, unconscionable or deceptive acts or practices, as described above, in which Plaintiffs relied upon to their detriment. In addition, the Firm at the direction of Mr. O'Quinn and Laminack, and with the assistance of Gibson, Pirtle, Martines, Molter, Farmer, Steed and Lowenberg, (1) wrongfully retained Plaintiffs' settlement proceeds for years in order to accumulate interest on the proceeds all the while charging Plaintiffs for any

interest accumulated on any money borrowed by the Firm to pay alleged expenses; (2) charging Plaintiffs an arbitrary 3.5% "general" silicosis charge even though Plaintiffs never agreed to such charge in their initial contract with O'Quinn; (3) entering into subsequent agreements with Plaintiffs which materially altered the terms of the representation without advising Plaintiffs of the pros and cons, advantages and disadvantages, implication and nature of the new agreement or advising them to retain outside counsel even when the new subsequent agreements where not fair and/or reasonable to Plaintiffs; (4) charging Plaintiffs unnecessary and/or unreasonable expenses; (5) intentionally failing to disclose issues or problems with the Firm's handling of the silicosis docket, including intentionally concealing the issues relating to stale settlements, or dismissed claims for several years; (6) willfully withholding pertinent information pertaining to Plaintiffs' settlements and their cases in an effort to retain Plaintiffs as clients and continue to obtain settlement proceeds on their behalf and thereby generate attorney's fees; and (8) destroying and altering Plaintiffs' files knowing that litigation was imminent.

13.     Plaintiffs' will show that the Firm and its lawyers' conduct, as described herein and above, was committed knowingly and intentionally as those terms are defined by Tex. Bus. & Com. Code Ann. Section 17.46 *et seq.*  Moreover, the conduct described herein and above constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment or opinion.  Accordingly, the Firm and these attorneys are liable to Plaintiffs for additional damages as provided by the DTPA, including treble damages and reasonable attorneys' fees necessary to bring this cause of action, all of which are being sought herein.

### F.     FRAUD, CONSTRUCTIVE FRAUD, FRAUD BY NONDISCLOSURE

14.     The conduct described above constitutes fraud, constructive fraud and/or fraud by nondisclosure. The Firm and its lawyers had a duty to make full disclosure of all material facts.

Nondisclosure of material facts are the equivalent to a false representation since the Firm and these attorneys had a duty to speak but instead deliberately remained silent. Here, the Firm and the lawyers, including Steed and Lowenberg failed to disclose material information about Plaintiffs' case and/or settlements as described above. The Firm and these attorneys failed to disclose these material facts notwithstanding their duty to disclose. Plaintiffs trusted the Firm and these attorneys to keep them informed about their case and relied upon this trust to their detriment. As a result, Plaintiffs suffered severe injury.

### G.   MISAPPLICATION OF FIDUCIARY PROPERTY

15.    The Firm and its lawyers violated section 32.45 of the Texas Penal Code (Misapplication of Fiduciary Property).  Pursuant to section 32.45, a violation occurs when a fiduciary intentionally, knowingly or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held.  The Firm and its lawyers owed a fiduciary duty to Plaintiffs as a matter of law.  Plaintiffs' cases, settlements  and client files were Plaintiffs' property held by the Firm and these attorneys. The Firm and these attorneys intentionally, knowingly or recklessly misapplied Plaintiffs' property and settlement proceeds by (1) charging excessive and/or unnecessary expenses; (2) charging Plaintiffs' general case expenses for those expenses relating to *other* Silicosis Clients cases or cases relating to the Texas litigation rather than specifically to Plaintiffs; (3) charging an arbitrary 3.0% pro-rata share of general expenses; (4) charging Plaintiffs for expenses relating to experts who were not qualified to render medical opinions in the case and/or whose opinions were rendered unreliable; (5) withholding Plaintiffs' settlement funds and monies, including refunds, for over six (6) years and until the threat of litigation ensued; and (6) destroying and altering Plaintiffs' original files.

16.     Clearly, such conduct involved a substantial risk of loss to Plaintiffs of their property, and in fact, such property was lost.  Therefore, the Firm and its lawyers violated section 32.45 of the Texas Penal Code and pursuant to Civil Practice and Remedies Code, Section 41.008 (c) the statutory caps for punitive and/or exemplary damages do not apply to this case.

### H.     NEGLIGENT MISREPRESENTATION

17.     Plaintiffs will show that the Firm and its lawyers are liable for damages based on negligent misrepresentation.  Specifically, Plaintiffs will show, as described above and in more detail throughout the course of the litigation, that the Firm and these attorneys made representations in the course and scope of their employment and/or the settlement negotiations regarding their silicosis cases either affirmatively or by silence when they had a duty to speak; that the representations supplied false information for the guidance of Plaintiffs in making decisions as to how to proceed with respect to their silicosis case and/or continuing the representation with O'Quinn; that the Firm and these attorneys, in making the representations, did not exercise reasonable care or competence in obtaining or communicating the above described information; and that Plaintiffs relied on the representations to their detriment. This conduct constitutes negligent misrepresentation for which Plaintiffs now sue.

### I.     CONSPIRACY TO COMMIT FRAUD

18.     Plaintiffs will show that the O'Quinn lawyers, including various defense counsel conspired to commit to conceal Defendants' malfeasance from Plaintiffs. O'Quinn and its attorneys are guilty of fraud and fraudulent concealment as described above. Indeed, O'Quinn and its attorneys were fraudulently concealing this malfeasance related to the silicosis docket for years.

**J.**   **NEGLIGENT SUPERVISION**

19.   Mr. O'Quinn was the sole owner of the Firm and was responsible for the supervision of the associates and partners at O'Quinn. As such, Mr. O'Quinn was personally responsible to see that Plaintiffs' underlying silicosis lawsuits were handled properly by the lawyers at the Firm. As described above, the Firm's handling of its silicosis docket was completely and horribly mismanaged. Thus, Mr. O'Quinn, individually, is jointly and severally liable for negligent supervision and all damages flowing from such negligence.

# VI
## *ALTERNATIVE* FACTS & ALLEGATIONS

1.   Plaintiffs believe that they have silicosis or a silica-related injury. However, should any defendant in this case take the position (and should it be proved) that some (or all) Plaintiffs never actually had silicosis; then the Firm, Mr. O'Quinn, Laminack, Pirtle, Martines, Steed, and Lowenberg are still liable under numerous theories and causes of action which are hereby plead *in the alternative* to the above theories and causes of action.

2.   If any Defendant in this case, including the Firm, take the position that some or all of the Plaintiffs never had silicosis and were falsely diagnosed with silicosis, the false diagnosis was a product of the Firm's own making and Defendants cannot escape liability. Should any prior diagnosis of Plaintiffs be shown to be false because the necessary procedures or methodology required to make the initial diagnosis were not implemented by the diagnosing doctors, then the Firm, Mr. O'Quinn, Laminack, Pirtle, Martines and the referring attorneys knew, from the outset, that the Plaintiffs who are proven falsely diagnosed never actually had silicosis. And, from the outset, this should have been disclosed to Plaintiffs rather than intentionally leading them to believe they had a disease that would cause a horrible death. Thus, the Firm, and these attorneys, at minimum, are liable for knowingly and deceitfully leading

Plaintiffs on to believe that they had been diagnosed with a fatal disease all in an effort to create a mass-silicosis docket and generate millions of dollars in fees and expenses and keep themselves, and the experts and screening companies that they retained, gainfully employed for roughly a decade. Such conduct represents a horrible and grave breach of fiduciary duty and O'Quinn and the attorneys should not be permitted to profit off their egregious conduct. *See Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999)(an agent who commits malfeasance should not profit from it).

3.      The Firm and its attorneys have affirmatively represented to Plaintiffs that they have silicosis, a disease which could ultimately lead to "progressive pulmonary fibrosis, spontaneous pneumothorax, autoimmune connective tissue diseases such as scleroderma, rheumatoid arthritis, systemic lupus erythematosus and others, tuberculosis, renal complications … lung cancer" and ultimately death.  Many of the Plaintiffs come from lower-class, hard working backgrounds who have spent their lives as laborers, foundry workers and sandblasters, which required them to work in uncomfortable environments, not in air conditioned luxury office buildings located at the Penthouse of the Lyric Centre. Because of their modest professions, many of these individuals simply cannot afford health insurance and do not possess the means to consult with a regular physician. Thus, they relied on the advice of their lawyers, the Firm, Mr. O'Quinn, Laminack, Pirtle, Martines, and the doctors they employed.

4.      After being diagnosed with silicosis by the doctors selected by O'Quinn and its attorneys, and being told by them, their fiduciaries, that they positively had the incurable disease, Plaintiffs began preparing for the worse. Plaintiffs understandably suffered severe mental anguish and distress. Many became depressed and mentally distraught over the diagnosis. They received condolences from family members and many dwelled over what they believed to be the

inevitable reality of an ever-impending, horrible decline in health and death.  Plaintiffs were simply unable to live their normal lives without the thought of their impending doom. Thereafter, they became distant from their families and friends. Many even made funeral arrangements and were unable to obtain health and/or life insurance.

5.      Meanwhile, the Firm under the direction of Mr. O'Quinn, Laminack, Gibson and Pirtle, and at the expense of their clients, continued to "fuel a silicosis litigation machine" by having their medical professionals diagnose as many clients as possible with silicosis. In fact, for every positive diagnosis the screening companies made, they were paid a "referral fee" of $350-$750. For a negative diagnosis they were paid nothing. Many times, if the screening came up negative, Plaintiffs were instructed to be re-screened, sometimes even three or four times, until they ultimately were diagnosed with silicosis. Clearly, there was an incentive, brought about by the Firm and its attorneys, to amass as many potential silicosis claimants as possible, regardless of the medical feasibility of such a diagnosis or regard as to the impact that such a serious diagnosis would have on their clients.

6.      In this scenario, the Firm, Mr. O'Quinn, Laminack, Pirtle and Martines knew, or should have known from the outset (back in 2001), that information they provided to medical professionals was false or incomplete and that current medical statistics made such voluminous diagnosis of silicosis virtually impossible. Nonetheless, the Firm and these attorneys solicited the medical professionals, who were fiduciaries to Plaintiffs, to accept a payment on the agreement or understanding that the payment would influence the conduct of the medical professionals in that they would diagnose the Plaintiffs with silicosis, even if it was contrary to existing medical procedures and methodology.

7.     The Firm's obvious disregard for the proper way to diagnose silicosis was evident. The Honorable Judge Janis Graham Jack ("Judge Jack"), of this very Court, in her June 30, 2005 Order after conducting numerous hearings on the issue stated:

> [T]he first essential step in diagnosing silicosis involves the taking of a thorough and appropriate occupational and exposure history. Unlike many of the other Plaintiffs' firms, O'Quinn did not ask the screening company (here, N&M) to take the histories; *instead, O'Quinn (or a "temp service" hired by O'Quinn) took the occupational and exposure histories.* O'Quinn only used N&M to take x-rays and perform PFTs; O'Quinn took responsibility for the histories and for coordinating the diagnostic process. As detailed above, both Dr. Harron and Dr. Levy relied totally upon the exposure histories provided to them by the lawyers. Dr. Levy was told that a physician had spent 90 minutes with each Plaintiff performing a detailed history and physical. This was shown to be false at the Daubert hearings, and *O'Quinn, at least, should have known it was false from the outset*, since the lawyers or their employees had taken the histories themselves.[7]

Thus, from the outset of the litigation where a client did not actually have silicosis, the Firm, Mr. O'Quinn,  Laminack, Pirtle, and Martines knew that the information being provided to their medical professionals to make the necessary silicosis diagnosis was incorrect, thereby rendering any opinions by such professionals erroneous. But this was never disclosed to Plaintiffs.

8.     Indeed, the Firm and these attorneys were aware that their medical experts were inadequate and the methodology employed by the experts would not be sufficient to support the Silicosis Clients' claims or pass a *Daubert* Hearing. Again, as found by Judge Jack:

> O'Quinn should have realized its diagnoses were fatally unreliable based upon the statistics referenced above, as well as the [depositions taken in the MDL]. This is especially true because *O'Quinn itself provided the inadequate occupational and exposure histories underlying the purported diagnoses.* Once O'Quinn donned a lab coat and injected itself into the diagnostic process, it is reasonable to charge them with knowledge both of what is required for a medically-acceptable diagnosis, and of how far *their diagnoses* strayed from that standard.[8]

---

[7] *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 675 (S.D. Tex. 2005)(emphasis added)(citations omitted).
[8] *Id.* at 675-676 (emphasis added)(citations omitted).

Thus, because the Firm, under the direction of these attorneys, did not follow the proper diagnostic process, the Firm, Mr. O'Quinn, Laminack, Pirtle, and Martines from the outset of the litigation had to know that claims might be rejected by the underlying silica defendants.

9.     Nonetheless, the Firm continued to file silicosis claims all in an effort to amass as many clients as possible and generate millions of dollars in fees for the Firm, it's attorneys and hundreds of thousands of dollars for their medical professionals all-the-while disregarding the health and welfare of their clients. Recognizing the sad reality that the attorneys like O'Quinn placed their interests above those of the clients, the Honorable Ed Whitfield shunned Defendants' conduct during a congressional hearing on the issue:

> [T]he type of screening used in this [silicosis] class action lawsuit simply generated claimants to obtain settlements for the benefit of certain plaintiff law firms. Dollars were the priority; patient health and wellbeing were afterthoughts.[9]

Under this scenario, Congressman Whitfield's statement could not be any more accurate.

10.     The reality of Congressman Whitfield's statement is further emphasized by the fact that while they generated millions for O'Quinn and its attorney, and kept numerous medical professionals gainfully employed, the settlements hardly benefited the Silicosis Clients. When the Silicosis Clients actually received settlements they were depleted by fees and unwarranted expenses. In fact, there were several instances where the Plaintiffs were forced to approve settlements where the Firm would recover expenses and fees, but the clients would receive nothing. The Firm, Laminack, Pirtle and Martines represented to the Intervenors that these settlements, where they would receive zero, were the best way to resolve their claims. In reality,

---

[9] *See* STAFF OF H. COMM. ON ENERGY & COMMERCE, MEMORANDUM TO THE SUBCOMM. ON OVERSIGHT AND INVESTIGATIONS: 109TH CONG., OVERSIGHT AND INVESTIGATIONS HEARINGS: ―THE SILICOSIS STORY: MASS TORT SCREENING AND THE PUBLIC HEALTH: FIRST DAY OF HEARINGS (Comm. Print March 8, 2006) at 2.

it was the best way for the Firm to obtain fees and the return of their lavish arbitrary and unwarranted expenses.

11.     In the end, the Firm, Mr. O'Quinn, Laminack, Pirtle and Martines, and later Steed and Lowenberg, were able to generate approximately $30 million in attorneys' fees and hundreds of thousands of dollars for the medical professionals and screening companies that they employed. They did this by placing their interests above those of their clients and by lying to their clients, this very Court  Congress and the Silicosis Defendants; convincing them all that Plaintiffs had silicosis. Millions of dollars were the priority; Plaintiffs' health and wellbeing were afterthoughts indeed.

## VII
### *ALTERNATIVE* CAUSES OF ACTION

1.     Based on the above alternative scenario, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to the Firm and its attorneys' conduct. The actions, as described in Section VI constitute breach of fiduciary duty, violations of the Texas Deceptive Trade Practices Act, fraud, constructive fraud, and/or fraud by non-disclosure, negligent misrepresentation, intentional infliction of emotional distress, and violates the commercial bribery statute of the Texas Penal Code.

### A.     BREACH OF FIDUCIARY DUTY

2.     An attorney client relationship existed between Plaintiffs and Defendants.  Thus, the Firm and its lawyers and the referring lawyers owed Plaintiffs various fiduciary duties as a matter of law, including: (1) Duty to act with loyalty and utmost good faith and fair dealing; (2) Duty to act with absolute perfect candor, openness, and honesty, without any deception or concealment, no matter how slight; (3) Duty to be strictly honest about fee agreements and to

refrain from self-dealing; (4) Duty to inform Plaintiffs of matters material to the representation; and (5) Duty to place the Plaintiffs' interests ahead of Defendants interests.

3.     The Firm and its lawyers, as well as Danzinger and Taylor, breached the foregoing fiduciary duties as set out above in Section VI. Specifically, the Firm and these lawyers placed their own interests above those of Plaintiffs and grossly misrepresented the health and welfare of Plaintiffs for the purpose of profiting off their potential disease.

4.     The Firm and these attorneys further intentionally breached the foregoing duties by, among other things, (1) conspiring with medical professionals, such as N&M, Dr. Harron, Dr. Levy, and others, to screen clients, knowing that such screenings were performed improperly and/or against proper medical procedures, in order to amass as large of a client list as possible to extort "global settlements" from the Silicosis Defendants; and (2) failing to disclose to Plaintiffs that they did not actually have silicosis, and leading Plaintiffs on to believe that they did in fact have the disease, when these defendants knew, as early as 2001, that their medical professionals relied totally upon the inadequate exposure histories provided to them by the Firm and therefore these physicians reports would be rendered suspect. As a direct result of the aforementioned breaches, Plaintiffs suffered injuries, both financially and mentally, in that they lived their lives believing they had been diagnosed with the incurable disease of silicosis while the Mr. O'Quinn, the Firm and its attorneys and the referring lawyers reaped the profits of any false diagnosis, which was a product of their own making.

### B.     VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

5.     Pursuant to *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1998), an express misrepresentation constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion, and thus violates Section 17.49(c)(3) of the Texas

Deceptive Trade Practices Act ("DTPA"). In this same regard, an attorney can be held liable to his client if he violates Section 17.49(c)(3) of the DTPA by engaging in an unconscionable action or course of action.

6.      Plaintiffs are consumers under the DTPA because Plaintiffs acquired goods or services from Defendants.  Under Plaintiff's alternative claims, the Firm and its attorneys and referring lawyers violated the DTPA because they engaged in false, misleading, unconscionable or deceptive acts or practices, as described above for which Plaintiffs relied upon to their detriment.  Specifically, the Firm and its attorneys, as well as its referral lawyers, conspired with and hired medical professionals, such as N&M, Dr. Harron, Dr. Levy, and others, to screen clients, knowing that such screenings were performed improperly and/or against proper medical procedures, in order to amass as large of a client list as possible to extort "global settlements" from the Silicosis Defendants all to the detriment of their clients. Furthermore, the Firm and its attorneys made misrepresentations and engaged in unconscionable actions by failing to disclose to Plaintiffs that they did not actually have silicosis (if in fact they didn't), and leading Plaintiffs on to believe that they did in fact have the disease, when these attorneys knew, as early as 2001, that their medical professionals relied totally upon the inadequate exposure histories provided to them by the Firm and therefore these physicians reports would be rendered suspect or inaccurate.

7.      Plaintiffs will show that the conduct, as described herein, was committed knowingly and intentionally as those terms are defined by Tex. Bus. & Com. Code Ann. Section 17.46 *et seq*.  Moreover, the conduct described herein constitutes an unconscionable action or course of action that cannot be characterized as advice, judgment or opinion.  Accordingly, the Firm and its attorneys, as well as the referral lawyers, are liable to Plaintiffs for additional

damages as provided by the DTPA, including treble damages and reasonable attorneys' fees necessary to bring this cause of action, all of which are being sought herein.

## C.    FRAUD, CONSTRUCTIVE FRAUD & FRAUD BY NON-DISCLOSURE

8. Plaintiffs will show that the Firm and its attorneys' conduct as described in Section VI constitutes fraud, constructive fraud, and/or fraud by non-disclosure. These attorneys, due to their fiduciary relationship with Plaintiffs, had a duty to make full disclosure of all material facts. Nondisclosure of material facts are the equivalent to a false representation since these attorneys had a duty to speak but instead deliberately remained silent. Moreover, a person making a representation to another has a duty to make a full representation with hiding material facts regarding the representation.  Additionally, if the representation is later found to be false, the person making the representation has a duty to inform the recipient of the falsity. Here, these attorneys not only failed to disclose to Plaintiffs that they did *not* have silicosis (if in fact they didn't), but they, and the medical professionals they employed, conspired and affirmatively represented to Plaintiffs that they had been diagnosed with the life-threatening and crippling disease.  Such non-disclosure and/or misrepresentations were made in an effort to "fuel a silicosis litigation machine" and generate tens of millions of dollars in attorneys' fees and expenses for the attorneys and the medical professionals they hired and prevent Plaintiffs from ceasing the representation. As a result, Plaintiffs suffered injury, both financially and mentally, in that they lived their lives believing they had been diagnosed with the incurable and crippling disease of silicosis while the Firm and these attorneys reaped the profits to the tune of at least $30 million dollars.

**D.**   **NEGLIGENT MISREPRESENTATION**

9.   Plaintiffs will show that Firm and its attorneys are liable for damages based on negligent misrepresentation.  Specifically, Plaintiffs will show, as described above and in more detail throughout the course of the litigation, that these attorneys, either personally or through the medical professionals that they employed, made representations in the course of their employment regarding Plaintiffs medical condition. Specifically, these attorneys represented to Plaintiffs that they had been diagnosed with the life-threatening disease of silicosis. Such representations supplied false information for the guidance of Plaintiffs in making his decisions as to how to proceed with respect to their silicosis case and/or continuing the representation with the Firm and its attorneys.  Plaintiffs will further show that these attorneys, in making the representations, did not exercise reasonable care or competence in obtaining or communicating the above described information for which Plaintiffs relied upon to their detriment.

**E.**   **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

10.   Plaintiffs will further show that the Firm and its attorneys are liable under a theory of intentional infliction of emotional distress. Plaintiffs are obviously persons. These attorneys acted intentionally or recklessly when they had their medical professionals diagnose Plaintiffs with silicosis (if in fact they did not have silicosis) in order to amass as large of a client list as possible to extort "global settlements" from the Silicosis Defendants. These attorneys knew, or had reason to know, that such acts and conduct would create a high degree of risk of harm to Plaintiffs in that they would reasonably believe that they had been diagnosed with a life threatening and crippling disease and have as little as two years to live. The emotional distress suffered by each Plaintiff was severe as Plaintiffs experienced fright, horror, mental breakdowns, worry, stress and other emotional distress that no reasonable person could expect to endure

without undergoing unreasonable suffering. Many Plaintiffs so strongly believed that they were going to die that they began making funeral arrangements.

11.     The Defendants' conduct, as described in Section VI, was extreme and outrageous and shocks the conscious of a civilized community. This is particularly true given the fact that the relationship between Plaintiffs and their attorneys was one of a fiduciary nature. As such, the Firm and its attorneys abused the trust, faithfulness, and candor of their position. Finally, Defendants' extreme and outrageous conduct was the proximate cause of Plaintiffs' emotional distress.

### F.     COMMERCIAL BRIBERY

12.     Plaintiffs will further show that the Firm and its attorneys violated Section 32.43 of the Texas Penal Code, and thus, pursuant to Texas Civil Practice and Remedies Code, Section, 41.008, punitive damage caps do not apply to these causes of action under Plaintiffs' alternative arguments in this case.  Section 32.43 of the Texas Penal Code provides in pertinent part:

(a) For purposes of this section:
   (1) "Beneficiary" means a person for whom a fiduciary is acting.
   (2) "Fiduciary" means:
      (A) an agent or employee;
      (B) a trustee, guardian, custodian, administrator, executor, conservator, receiver, or similar fiduciary;
      (C) a *lawyer, physician*, accountant, appraiser, or ***other professional advisor***; or
      (D) an officer, director, partner, manager, or other participant in the direction of the affairs of a corporation or association.

(b) A person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

(c) A person commits an offense if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under Subsection (b).

TEX. PENAL CODE § 32.43 (emphasis added).

13.     The medical professionals and screening companies hired by the Firm and its attorneys and the referring lawyers were physicians and/or other professional advisors and therefore were fiduciaries to Plaintiffs, the beneficiaries, pursuant to subsection (a)(2).  The Firm and its attorneys and the referring lawyers solicited the medical professionals to accept payments of $350-$750 for every *positive* diagnosis of silicosis on the agreement or understanding that the payment or benefit would influence the conduct of the medical professionals in that they would diagnose Plaintiffs with silicosis, even if it was contrary to existing medical procedures and methodology. Therefore, the Firm and these attorneys violated section 32.43 (c) by offering, conferring, or agreeing to confer a benefit to the medical and other professionals, the acceptance of which is an offense under Section 32.43 (b).

14.     Alternatively, the Firm and its attorneys and the referring lawyers, who were fiduciaries to Plaintiffs, intentionally or knowingly solicited, accepted, or agreed to accept a benefit from the medical professionals or screening companies on agreement or understanding that the benefit received from the false or inaccurate diagnosis – *i.e.* millions of dollars in attorneys' fees, salaries and expenses for the ability to represent the silicosis client – would influence the conduct of these attorneys in relation to their affairs of Plaintiffs in that they would breach their duties to clients by not making full disclosures concerning their health or silicosis case. Thus, the Firm and its attorneys violated section 32.43 (b).

15.     Texas Civil Practice and Remedies Code, section 41.008 provides that punitive damages are not capped against a defendant for a plaintiff who seeks recovery of exemplary damages based on conduct described as a felony under section 32.43 of the Texas Penal Code. Thus, no punitive damage caps apply to this case.

## VIII
## CONSPIRACY AND AIDING & ABETTING

1.      The Firm and its attorneys' conduct constitute a violation of all three doctrines under aiding and abetting, *i.e.*, (1) assisting and encouraging; (2) assisting and participating; and (3) concert of action.  Plaintiffs will show that these attorneys aided and abetted by personally assisting and participating in the above described circumstances.  Specifically, these attorneys aided or assisted each other or other fiduciaries in breaching their fiduciary duties to Plaintiffs and to commit the conduct described in Sections VI and VII. Alternatively, the Defendants assisted and encouraged one another and their medical professionals to render suspect diagnoses of silicosis for their own gain and to the detriment of their clients and commit the conduct described in Sections VI and VII. These attorneys' assistance was substantial and these attorneys had knowledge of the purpose of the above described circumstances and acts.  This activity was likely to and did cause injury to Plaintiffs.

2.      Plaintiffs will further show that the Firm and these attorneys and the referring lawyers conspired to commit the acts as outlined above in Section VI and VII against Plaintiffs. Alternatively, Plaintiffs will further show that the Firm and these attorneys and the referring lawyers conspired to commit the acts as outlined above in Section VI and VII against Plaintiffs. The conspiracy caused Plaintiffs the damages alleged herein. Based on information and belief, the Firm and its attorneys willfully suppressed the truth as to the activity or inactivity taking place on Plaintiffs' silicosis lawsuits. The co-conspirators include various attorneys at the Firm and other individuals or entities including the medical and other professionals that they hired including the screening companies. The Firm and its attorneys, in addition to other individuals and entities either: (1) actively took part in the suppression, concealment and misrepresentation of the activity or inactivity of Plaintiffs' silicosis lawsuit; (2) furthered the plan or plans by

cooperation and request; (3) aided or encouraged the actual wrongdoers; or (4) ratified and adopted the wrongdoer's acts for their benefit.

## IX
## VICARIOUS LIABILITY

1.     The O'Quinn Law Firm and/or John M. O'Quinn & Associates in addition to all other entities John M. O'Quinn operated under is liable under the doctrine of *respondeat superior* for the acts of any of its attorneys, including, but not limited to Mr. O'Quinn, Laminack, Pirtle, Martines,  Steed and Lowenberg who at all times relevant hereto were acting in the course and scope of the employment with the Firm.

## X
## ALTER EGO

1.     All of the entities that John M. O'Quinn practiced law under were in fact the alter ego of John M. O'Quinn individually.  John M. O'Quinn was the sole equity owner in each of the entities he practiced law under and was solely responsible for the ultimate management decisions regarding every aspect of the firms' silicosis docket.  Therefore, all liability for the actions of the lawyers at the various firms ultimately fall at the feet of John M. O'Quinn.

## XI
## DISCOVERY RULE

1.     Plaintiffs affirmatively plead the discovery rule to any defense of limitations asserted by any Defendant to any of Plaintiffs' causes of action in this litigation.

## XII
## ACCOUNTING

1.     Plaintiffs further request an accounting for a number of expenses that were assessed and charged against them by the Firm which are believed to be excessive in nature and/or improper. Such overcharging and assessments would amount to additional breaches of

fiduciary duty and support Plaintiffs' fraud and DTPA claims which can only be determined by a true and accurate accounting. Plaintiffs further request an accounting of all attorneys' fees generated by the Firm's silicosis docket and all settlement funds disbursed to Plaintiffs.

## XIII
## DAMAGES

### A.   ACTUAL DAMAGES

1.      Regarding the causes of action and conduct alleged above, each Plaintiff has sustained pecuniary losses that were proximately caused by the Firm and its lawyers' conduct. Plaintiffs hereby seek the maximum allowable amount of actual damages that exceed the jurisdictional limits of this court.

### B.   ATTORNEYS' FEES

2.      As a result of the Firm, its attorneys and the referral lawyers' violation of the DTPA and breach of contract, Plaintiffs are entitled to reasonable attorneys' fees necessary to prosecute this action. Texas law recognizes that contingency fees can be reasonable and necessary under the circumstances. Under these circumstances, a reasonable attorneys' fee of 40% of the entire recovery should be assessed against Defendants.

### C.   EXEMPLARY DAMAGES

3.      Based upon the Firm, its attorneys' and referral lawyers' intentional breaches of fiduciary duty, gross negligence, fraud and intentional infliction of emotional distress, Plaintiffs are entitled to exemplary/punitive damages. Moreover, Texas Civil Practice and Remedies Code, section 41.008 provides that punitive damages are not capped against a Defendant for a Plaintiff who seeks recovery of exemplary damages based on conduct described as a felony under section 32.43 and 32.45 of the Texas Penal Code. Accordingly, because of the Firm, its attorneys and the referring lawyers' conduct that constitutes commercial bribery and misapplication of fiduciary

property, as outlined above, Plaintiffs are entitled to unlimited exemplary damages to be determined by the jury.

### D.     TREBLE DAMAGES

4.     Due to the Firm, its attorneys and the referral lawyers' intentional and/or knowing violations under Texas Deceptive Trade Practices Act, Plaintiffs are entitled to treble damages for which they seek herein.

### E.     MENTAL ANGUISH DAMAGES

5.     Plaintiffs are entitled to mental anguish damages pursuant to the Texas Deceptive Trade Practices Act and because Plaintiffs' mental anguish was a foreseeable consequence of the various breaches of fiduciary duty. Moreover, Plaintiffs are entitled to mental anguish damages under their alternative theory of intentional infliction of emotional distress claim. Accordingly, Plaintiffs hereby seek mental anguish damages herein.

### F.     FEE AND EXPENSE FORFEITURE

6.     Due to the Firm, its attorneys or the referral lawyers' blatant and intentional breach of fiduciary duty and violations of the Penal Code and Texas Disciplinary Rules of Professional Conduct relating to Barratry, Plaintiffs are entitled to the disgorgement of fees and/or expenses paid to these Defendants.  Thus, Plaintiffs seek total fee forfeiture due to the egregious conduct outlined above.

## XIV
## JURY DEMAND

1.     Plaintiffs desire to have a jury decide this case and makes this formal request pursuant to Federal Rule of Civil Procedure 38 and 39.

## XV
## CONDITIONS PRECEDENT

1.      All conditions precedent have been performed or have occurred as required by Texas Rule of Civil Procedure 54.

## XVI
## PRAYER

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against all Defendants jointly and severally as prayed for, that costs of court be taxed against all Defendants, that Plaintiffs have prejudgment as well as postjudgment interest, and for such other and further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will ever pray.

Respectfully submitted,

**THE KASSAB LAW FIRM**

/ s / Lance Christopher Kassab
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
Federal Bar No. 20092
lck@texaslegalmalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
Federal Bar No. 1561652
dek@texaslegalmalpractice.com
1420 Alabama
Houston, Texas 77004
t.713.522.7400
f.713.522.7410

**ATTORNEYS FOR PLAINTIFFS**